IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
v.                             )        No. 3:24-CR-80-KAC-JEM
                               )
KHALID SULLIVAN,               )
                               )
            Defendant.         )

## REPORT AND RECOMMENDATION

All pretrial motions are referred to the undersigned for disposition or recommendation as appropriate. *See* 28 U.S.C. § 636(b). This case is before the undersigned on Defendant Khalid Sullivan's Motion to Suppress [Doc. 29].

Defendant is charged with three counts of knowingly and intentionally distributing fentanyl [Doc. 6 pp. 1–2]. Defendant is also charged with one count of possession with intent to distribute fifty grams or more of actual methamphetamine and one count of possession with intent to distribute forty or more grams of a mixture or substance containing fentanyl [*Id.* at 2]. Finally, Defendant is charged with one count of possession of a firearm in furtherance of drug trafficking and one count of being a felon in possession of a firearm [*Id.* at 3]. These charges arise in part out of law enforcement's execution of a search warrant at a Knoxville, Tennessee apartment on July 9, 2024. Defendant moves to suppress all evidence seized from the apartment, arguing the search violated his rights under the Fourth Amendment [Doc. 26 p. 1]. Defendant argues that the supporting affidavit fails to provide probable cause to issue the search warrant because it does not show a nexus between the apartment and drug trafficking, does not establish the reliability of confidential sources, and contains stale information [*Id.* at 11–21].

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds the affidavit establishes probable cause for the search warrant and recommends the District Judge **DENY** Defendant's Motion to Suppress.

## I.    BACKGROUND AND EVIDENCE

In support of the search warrant of 5101 Asheville Highway, Apartment Unit 24, Knoxville, TN 37914 ("the apartment"), Knoxville Police Department ("KPD") Officer Todd Strickenberger submitted an affidavit [Doc. 29-1]. In his affidavit, Officer Strickenberger states there is probable cause to believe that individuals are using the apartment, located in the Holston Place Apartments ("apartment complex"), to manufacture, sell or deliver controlled substances, and possess controlled substances and drug paraphernalia and that the apartment will contain evidence of those offenses [Doc. 29-1 pp. 1, 7].

Officer Strickenberger states that in mid-January 2024, a reliable confidential informant told him that a black male he/she knew as Khalid Sullivan was selling heroin in the Knoxville area [*Id.* ¶ 3]. The confidential informant reported that Sullivan deals drugs out of rental cars in various parking lots in the area [*Id.*]. Additionally, the confidential informant provided a phone number for Sullivan and stated that his Cash App account name is "Khalid Sullivan" [*Id.*]. Further investigation into law enforcement databases linked this individual with Khalid Kari Sullivan [*Id.*].

On April 24, 2024, officers with the KPD Organized Crime Unit ("OCU") utilized a confidential informant to conduct a controlled purchase of "heroin/opiate" [*Id.* ¶ 4]. The confidential informant called the previously referenced phone number, which was known to be used by Sullivan, to set up the controlled purchase, and a male directed the informant to meet "at the Walgreens on Magnolia Avenue," which is on Asheville Highway less than one mile from the apartment [*Id.*]. The confidential informant completed the controlled buy, purchasing a substance,

which field tested presumptively positive for Xylazine and fentanyl [*Id.*]. The confidential informant identified the individual with whom he met for the controlled buy as Sullivan [*Id.*]. Based on his training and experience, Officer Strickenberger states that Xylazine is used as a cutting agent for fentanyl and is known to mask results of fentanyl on certain field tests [*Id.*]. The affiant states that this confidential informant is knowledgeable regarding drug trafficking, and that law enforcement corroborated the information from the controlled purchase through "real-time surveillance" and review of the audio and/or video recording [*Id.* ¶ 5].

Officer Strickenberger relates that during the controlled purchase on April 24, 2024, surveillance units observed Sullivan driving a rented white Dodge Durango with the Texas license plate SRF9333 [*Id.* ¶ 6]. Using law enforcement databases, Officer Strickenberger determined that the rented white Dodge Durango was parked at the apartment complex on May 5, 2024 [*Id.*]. On May 8, 2024, Officer Strickenberger noticed the white Dodge Durango was replaced by a second rental vehicle, a silver Toyota 4Runner [*Id.*]. Officer Strickenberger observed the silver Toyota 4Runner at the apartment complex on numerous dates, until June 6, 2024, when it was replaced by a third rental, a white Dodge Hornet [*Id.*]. Based on his training and experience, Officer Strickenberger reports that narcotics traffickers commonly use rental vehicles and trade them out to thwart law enforcement detection [*Id.*]. During surveillance at the apartment complex on June 6, 2024, the affiant saw Sullivan operating a silver Chevrolet Impala with tinted windows [*Id.*]. The affiant saw Defendant exit the Impala and enter an apartment on the far-right or south side of the second floor; however, he could not see which apartment Defendant entered due to a tree blocking his view [*Id.*].

The affidavit further relates that on June 7, 2024, law enforcement, including a Tennessee Bureau of Investigation "aerial asset," conducted surveillance on the activity between the white

3

Dodge Hornet rental and the silver Chevrolet Impala [*Id.* ¶ 7]. During the operation, surveillance units saw a black male leaving the second floor of the apartment complex, enter the silver Chevrolet Impala, drive away, and a short time later, arrive at the Walgreens located at Asheville Highway (the same meeting place as the April 24, 2024 controlled purchase) [*Id.*]. There, surveilling officers saw a short interaction, consistent with a hand-to-hand drug transaction, between the white female driver of a silver van and the driver of the silver Chevrolet Impala [*Id.*]. The driver of the Chevrolet Impala then returned to the apartment complex, exited the vehicle, and entered the second floor of the apartment building, on the right side [*Id.*]. Officer Strickenberger determined from the license plate of the silver Chevrolet Impala that it was registered to Sullivan, with the address of 5101 Asheville Highway, apartment 24 [*Id.*].

That same day, law enforcement saw Defendant leave the courtyard of the apartment complex, enter the Chevrolet Impala, drive to the parking lot of a Starbucks at 116 Merchants Drive, and conduct a hand-to-hand transaction with the driver of a red Chevrolet Cruz [*Id.* ¶ 8]. After the transaction, law enforcement approached the occupants of the red Chevrolet Cruz and saw the driver and the passenger cutting up grey powder on a cell phone and holding a cut straw [*Id.*]. From their training and experience, the surveilling officers knew the subjects were preparing to ingest an illegal narcotic and immediately removed the occupants from their vehicle [*Id.*]. The individuals admitted they had just purchased heroin and were preparing the drug for use [*Id.*].

On June 21, 2024, Officer Strickenberger and OCU detectives utilized a confidential informant to conduct a second controlled purchase of drugs from Sullivan [*Id.* ¶ 9]. The confidential informant called the same phone number previously known to be used by Sullivan and ordered a quantity of suspected heroin/opiate [*Id.*]. Law enforcement observed Defendant leave the area of apartment 24 and drive directly to the arranged location to meet with the awaiting

confidential informant [*Id.*]. After the buy, the purchased narcotics tested presumptively positive for Xylazine and Diphenhydramine [*Id.*]. Officer Strickenberger states this controlled buy further supports that Sullivan is storing and/or packaging narcotics at the apartment and resorting to the location each time he made a drug deal [*Id.*]. The affiant also states that the confidential informant is knowledgeable about drug trafficking and that officers corroborated the information from the informant through "real-time surveillance" and reviewing the audio and/or video recording of the controlled buy [*Id.* ¶ 10].

On June 25, 2024, Officer Strickenberger conducted surveillance on the apartment and witnessed Sullivan exit the silver Chevrolet Impala, walk directly to the door of apartment 24, manipulate the lock on the door of unit 24, and enter the apartment with an unknown black female [*Id.* ¶ 11]. That Sullivan manipulated the lock on the door further demonstrated to Officer Strickenberger that Sullivan had control over the unit [*Id.*].

Finally, on July 3, 2024, Officer Strickenberger and OCU officers used a confidential informant to conduct a third controlled purchase of heroin/opiate from Sullivan [*Id.* ¶ 12]. The confidential informant again called the phone number previously known to be used by Sullivan and ordered a quantity of heroin/opiate [*Id.*]. OCU surveillance officers observed Sullivan leave the area of apartment unit 24 and drive directly to the location to meet the awaiting confidential informant [*Id.*]. Officer Strickenberger states that the transaction was successful and resulted in a purchase of suspected heroin/opiate [*Id.*]. Based on his training and experience, Officer Strickenberger reports that the substance resembled the appearance and consistency of heroin/opiates [*Id.*]. After the controlled buy, the confidential informant advised that the individual who met with him/her and sold him/her heroin/opiate was Defendant [*Id.*]. Officer Strickenberger

stated this controlled buy supports his belief that Defendant is storing and/or packaging narcotics at the apartment and resorting to the apartment each time he makes a drug deal [*Id.*].

Based upon the affidavit of Officer Strickenberger, Knox County Magistrate Judge Hector Sanchez issued a search warrant for apartment 24 of the Holston Place Apartments at 5101 Ashville Highway [Doc. 29-2 pp. 1–4; Doc. 1 p. 3]. On July 9, 2025, law enforcement executed the search warrant at apartment 24 and seized methamphetamine, suspected fentanyl, three loaded handguns, $12,290 in currency, and various items used to manufacture and distribute narcotics [Doc. 1 p. 3].

On March 6, 2025, Defendant filed a Motion to Suppress, arguing that the supporting affidavit fails to provide a nexus between the apartment and drug evidence, that the confidential sources' information was not sufficiently reliable, and the information in the affidavit was stale [Doc. 29 pp. 11, 16, 20]. Defendant attached a copy of Officer Strickenberger's affidavit, the search warrant, and the return to his motion [Docs. 29-1, 29-2, & 29-3]. The Government responded in opposition to the suppression motion [Doc. 30], also attaching a copy of the affidavit for the search warrant [Doc. 30-1]. It argues that Defendant fails to show he has standing to challenge the search warrant, the issuing judge had a substantial basis to issue the search warrant, and even if probable cause is lacking, the officers executed the search warrant in good faith [Doc. 30 pp. 1, 7–16].

The parties appeared before the undersigned on April 22, 2025, for a motion hearing. Assistant United States Attorney Keith Hollingshead-Cook appeared on behalf of the Government. Attorney Forrest Wallace represented Defendant, who was also present.

At the hearing, Defendant called Oksanna Toombs to testify about Defendant's standing to challenge the search of apartment 24 [Doc. 31, Minutes]. Ms. Toombs testified that Defendant was

6

her boyfriend, that they dated on and off, and that they were going steady for year and a half. She said in March 2024, Defendant moved in with her at apartment 24 of the Holston Place Apartments on Asheville Highway. She stated that when Defendant moved in, he brought clothing and personal items, and he had an app on his phone that allowed him to unlock the apartment using a passcode. Ms. Toombs stated that only Defendant, her cousin, and herself had access to this passcode. She said the cousin would stay over as a guest on occasion but did not live there. Ms. Toombs stated that Defendant had the same right as she did to exclude other people from the apartment.

On cross-examination, Ms. Toombs stated Defendant was not on the lease, but that he helped pay rent. She said Defendant slept at her apartment most nights, but ten percent of the time, he stayed at other places. Ms. Toombs agreed that Defendant had access to the entire apartment, used all of the apartment, and kept his personal effects there. Ms. Toombs stated that when Defendant spent the night, he slept in the bedroom with her.

Following the hearing, the undersigned took the matter under advisement.

## II.     ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. A search warrant for a residence must be based upon probable cause and must state the items to be seized with particularity. *Id.*; *Collins v. Virginia*, 584 U.S. 586, 593 (2018) ("At the [Fourth] Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (citations omitted & cleaned up)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). "[P]robable cause is a flexible, common[-]sense standard," causing a person "of reasonable caution" to believe that the items are evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983). In other words,

7

probable cause is "reasonable grounds for belief[] supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances related in the affidavit. *Gates*, 462 U.S. at 238.

An issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Gates*, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. *Id.* "The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39. In reviewing the sufficiency of probable cause for a search warrant, the Court only considers the information that was before the issuing judge—that is, the information contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).

Defendant challenges the search of apartment 24, in which he claims a legitimate expectation of privacy. Defendant also contends the affidavit fails to provide probable cause because it does not establish a nexus between the apartment and drug trafficking [Doc. 29 pp. 11–16]. Additionally, Defendant argues that probable cause is lacking because the confidential informants' information was not sufficiently reliable and the information used to support the search warrant was stale [*Id.* at 16–21].

The Government asserts first that Defendant failed to establish a legitimate expectation of privacy in the apartment needed to challenge a search, and second, the issuing court had a

substantial basis for finding probable cause to authorize the warrant, and finally, even if probable cause was lacking, the executing officer's reasonably relied on the search warrants in good faith [Doc. 30 pp. 1, 7–16].

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds Defendant has standing to contest the search of the apartment. The undersigned also finds the state court judge validly issued the search warrant for the apartment because the supporting affidavit provides a nexus between the apartment and the drug trafficking, establishes the reliability of the confidential sources, and is not stale. Even if probable cause were lacking, the undersigned finds the officers executed the search warrant in good faith.

### A.    Standing

A claimant alleging a Fourth Amendment violation must have a legitimate expectation of privacy in the place searched or the thing seized. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978). "[S]tanding is 'an element' of a Fourth Amendment suppression claim[,]" and the person raising the Fourth Amendment challenge shoulders the "burden" of demonstrating his or her standing. *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022). The term "standing" has become "shorthand" for the requirement that a defendant must show that a search or seizure infringed upon his or her own rights. *Id.* at 374. Accordingly, a defendant must show that the search of the residence infringed upon his personal rights or legitimate expectation of privacy in the residence. *Id.* at 375; *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (holding a defendant challenging a search has the burden of demonstrating his or her legitimate expectation of privacy in the location).

The Supreme Court has recognized that a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to

recognize as reasonable." *Minnesota v. Olson*, 495 US. 91, 96–97 (1990). In other words, an overnight social guest "has a reasonable expectation of privacy in the place where he sleeps at night." *United States v. Allen*, 720 F. App'x 254, 257–58 (6th Cir. 2018) (citing *Olson*, 495 U.S. at 96–97) (finding a defendant had a reasonable expectation in a bedroom where he was an overnight guest, even though the defendant conducted illegal business from that apartment, because "it was his home for the two weeks he lived there"); *see also United States v. Pollard*, 215 F.3d 643, 645–47 (6th Cir. 2000) (recognizing a reasonable expectation of privacy where defendant had occasionally spent the night on the couch, had a personal relationship with the tenant, and kept some personal belongings in a closet). *Cf. Minnesota v. Carter*, 525 U.S. 83, 90–91 (1998) (explaining that an individual in another's residence for a short time to engage in drug trafficking has no legitimate expectation of privacy in the residence). In assessing the reasonableness of a defendant's expectation of privacy, the Court examines

> the person's proprietary or possessory interest in the place to be searched or the item to be seized[;] whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000) (alteration in original).

Here, Defendant contends he has standing to challenge the search because "[t]he affidavit in support of the search warrant includes a description of the real property to be searched and then lists 'Khalid Sullivan' as the person by whom the premises was occupied or was under the control of" [Doc. 29 pp. 1–2]. Defendant argues this establishes Defendant's reasonable expectation of

privacy in the place searched [*Id.*]. At the motion hearing, Defendant also offered the testimony of Oksanna Toombs, to speak on the issue.

Ms. Toombs stated that Defendant moved into the apartment with her around March 2024, and lived with her until the execution of the search warrant on July 9, 2024. Ms. Toombs testified that when he moved in, he brought clothing and personal items. She explained that while her apartment door did not have a key, it was opened through an app, which required a passcode, and that Defendant had access to both the app and the passcode and used them to come and go as he pleased. Ms. Toombs maintained that Defendant had the same right as she did to exclude other people from the apartment. Ms. Toombs stated he stayed at the apartment with her around ninety percent of the time, and that ten percent of the time he would stay at other places. She further stated he helped pay rent, and that only herself, Defendant, and her cousin had access to the apartment through the phone app. Ms. Toombs clarified that her cousin did not live there but stayed there sometimes as a guest. Finally, Ms. Toombs testified that he had access to the entire apartment, used all the apartment, kept his personal effects and valuables there, and slept in the bedroom with her when he stayed the night.

Based upon the testimony of Ms. Toombs, along with the minimal information from the affidavit, Defendant shows by a preponderance of the evidence that he has a legitimate expectation of privacy in the apartment. The Government argues that Defendant fails to show his subjective expectation of privacy simply by pointing to information in the affidavit [Doc. 30 pp. 7–8]. But here, Defendant provides the testimony demonstrating the apartment was his primary residence for the four months preceding the search. The undersigned therefore finds that Defendant has shown that he has standing to challenge the search.

11

**B.      Nexus**

To satisfy the requirements of the Fourth Amendment, a search warrant must be based on an affidavit containing "particularized facts" that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In other words, probable cause requires a "nexus between the place to be searched and the evidence sought." *Id*. (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 595). Assessing whether an affidavit establishes a nexus turns upon the facts of a particular case and requires examination of the totality of the circumstances. *Id*. The Court must determine "whether the [issuing judge] had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Merriweather*, 728 F. App'x 498, 504 (6th Cir. 2018) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

Defendant contends the affidavit "does not contain sufficient facts to establish a nexus between the drug evidence sought and the residence that the officers searched" [Doc. 29 p. 11]. Defendant argues that the affidavit is replete with conclusory statements and speculative assumptions but fails to connect him, apartment 24, and drug trafficking [*Id*. at 16]. Defendant argues that none of the sources personally bought drugs from Defendant in or and around the apartment, and "no affiant stated that [Defendant] lived at the apartment" [*Id*. at 14]. Moreover, he

maintains the affidavit fails to show that he rented the vehicles observed in the complex's parking lot or that he was the subscriber for the telephone number used by the confidential sources to set up controlled drug purchases [*Id*. at 11–12, 15]. Defendant contends that "the only stated facts that connect [Defendant] with unit 24 are the vehicle registration's listed address . . . and the affiant seeing [Defendant] . . . unlock the apartment's door while accompanied by an unknown woman" [*Id.* at 15]. With regard to the vague references to the "black male" entering and leaving the apartment on June 7, 2024, Defendant argues "[i]t is an assumption to conclude he exited and re-entered the same unit, since the affidavit does not mention him even being inside a unit" [*Id.* at 13]. At the hearing, however, Defendant conceded that the affidavit shows that he was dealing drugs.

Circumstantial evidence of an individual leaving a location and soon engaging in a drug sale "suggest[s] that the illicit materials came from the location." *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (citations omitted). Similarly, a defendant's "return[] to the location sought to be searched, [following a controlled buy,] create[s] a reasonable inference that the defendant took the proceeds with him." *Id*. (citations omitted). "[A] warrant's validity does not turn on whether it is supported by an 'actual showing' of criminal activity at the targeted location." *Id.* (quoting *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019)). "[I]nstead[, the Court] ask[s] whether officers provided direct or circumstantial support to create 'more than mere suspicion' that contraband will be found at the location in question." *Id*. (quoting *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (citation omitted)).

Here, law enforcement connected both the apartment and Defendant to drug trafficking activity through the Chevrolet Impala registered in Defendant's name, which listed the apartment as the associated address. Defendant drove the Impala to a confirmed drug transaction on June 7,

13

2024. Additionally, of the five reported drug transactions in the affidavit, Defendant was seen leaving and/or returning to the apartment complex on four occasions. On two of those occasions, Defendant was driving the Chevrolet Impala. On two separate instances, Defendant was seen driving the Chevrolet Impala to the apartment complex; one of those times, the affiant witnessed Defendant exit the car, go to unit 24, "manipulate the lock," and enter. Although the affidavit does not explicitly state that Defendant entered or exited unit 24 each time, the nexus is nonetheless strengthened by repeated observations of Defendant entering and exiting the area of the apartment on multiple different occasions between May 5, 2024 and July 3, 2024. *See Sanders*, 106 F.4th at 463 (finding evidence indicating a defendant left the residence, sold drugs to an informant, and then returned to the residence justified finding there was a sufficient nexus between the drug transaction and the residence); *see also United States v. Whitesdale*, 141 F.4th 734, 742 (6th Cir. 2025) (noting that courts are entitled to draw reasonable inferences about where evidence is likely to be kept, limited to the information presented in the four corners of the affidavit).

But the most compelling connection between Defendant and apartment arises from the events of June 7, 2024. On that day, surveilling officers saw a black male leave the second floor of the Holston Place apartment complex, get in the Chevrolet Impala, drive to a secondary location, and engage in a short interaction with the driver of another vehicle consistent with a drug transaction. The black male then returned to the apartment and entered the second floor of the apartment complex, walking toward the right side of the building, which is where apartment 24 is located. Later that same day, officers saw Defendant leave courtyard of the apartment complex, return to the Chevrolet Impala, drive to a different location, and conduct a second hand-to-hand transaction that was soon after confirmed to be the sale of heroin. "Evidence that one leaves a 'residence, engage[s] in a drug transaction, and then return[s] into the residence' 'plainly

demonstrate[s] a sufficient nexus' with the location." *Sanders*, 106 F.4th at 463 (citations omitted). And only a single instance of a defendant leaving a residence, completing a drug transaction, and returning to that residence is sufficient for a finding of probable cause. *United States v. Florence*, No. 24-3729, 2025 WL 2539022, at *2 n.1 & *3 (6th Cir. Sept. 4, 2025) (noting that in *Sanders*, "the officers' observation of [the defendant] leaving his residence, completing *a single* drug transaction, and returning to a residence was enough for the *Sanders* court to find probable cause to search that residence" (citing *Sanders*, 106 F.4th at 463)).

Defendant objects that the multiple statements of him or a black male leaving the *area* of apartment 24, rather than the apartment itself, is insufficient to provide a nexus [Doc. 29 pp. 14–15]. While the officers did not see Defendant exit or enter apartment 24 when they observed his alleged drug dealing activity, there were two additional observations that connected Defendant with apartment 24. First, the Government notes that officers "saw Sullivan enter the door of Apartment 24, on June 25, 2024" [Doc. 30 p. 11]. Second, "Sullivan's Chevrolet Impala was registered in his name and to Apartment 24's address, which indicates a connection to the apartment" [*Id.*]. The undersigned finds that these additional observations provide sufficient corroboration to infer that the apartment unit Defendant left to deliver drugs on June 7, June 21, and July 3 was apartment 24. *See United States v. Jones*, 817 F.3d 489, 491 (6th Cir. 2016) (finding observations that a defendant got into a vehicle registered to a person at an address and sold drugs immediately after leaving that address corroborated a tip that drugs were sold there).

The undersigned therefore finds that Officer Strickenberger's affidavit establishes a nexus between apartment 24 and the alleged drug trafficking.

## C.    Confidential Informant Reliability

Defendant also challenges the sufficiency of probable cause, arguing that the "affidavit does not contain sufficient information to show the veracity and reliability of the sources or that their information was adequately corroborated" [Doc. 29 p. 17]. Specifically, Defendant argues the affidavit fails to delineate how many sources were used by the police or to connect a specific source with a specific event [*Id.* at 17–18]. Defendant also challenges the affidavit's description of the first confidential informant, asserting that the only information regarding their veracity, reliability, and basis of knowledge was merely a conclusory statement that he or she was a "reliable informant" [*Id*. at 18]. Additionally, Defendant argues that the "vouching paragraph and the corroboration" following the paragraphs on two controlled buys using confidential informants were "self-fulfilling" in that the sources used only played a passive role in the controlled buys [*Id*. at 19]. Finally, "by not including [the vouching] paragraph after the buy on July 3, 2024," Defendant concludes "it is reasonable to conclude that the affiant did not find that the source's actions that day had been sufficiently corroborated" [*Id.*].

But Defendant's arguments that affidavit's statements on the reliability of the confidential sources is conclusory, self-fulfilling, and insufficiently corroborated are unpersuasive. The credibility of CI's "can be corroborated with a controlled buy." *United States v. Moore*, 999 F.3d 993, 997 (6th Cir. 2021) (collecting cases). The information supplied by the informants here was sufficiently reliable. The affidavit detailed each of the controlled buys, and "described the steps taken by officers to ensure the buy occurred, such as searches of the informant before and after . . . and the use of prerecorded money" for two out of three of the controlled buys. *Id.* (citing *United States v. Abdalla*, 972 F.3d 838, 849–50 (6th Cir. 2020)). Additionally, here, law

16

enforcement also reviewed the audio and/or video recordings of the April 24 and June 21 controlled buys. This information, collectively, corroborated the informants' credibility.

Although Defendant criticizes the lack of the corroborating paragraph for the fourth CI, the affidavit still reflects that this individual's credibility was supported by the details of the controlled buy and by the safeguards employed by law enforcement to ensure the transaction's reliability [Doc. 29-1 ¶¶ 4, 5, 9, 10, 12]. And the reliability of initial confidential source, who provided the tip that Defendant was selling heroin in Knoxville, Tennessee, is supported by the subsequent controlled buys of heroin or other opiates from Defendant in Knoxville. The phone number provided by that initial source was used to set up the three controlled buys on April 24, June 21, and July 3, in which the sources affirmatively identified Defendant as the seller of heroin. Finally, the initial source provided the name and cash app account for Khalid Sullivan, which law enforcement corroborated through law enforcement databases.

Accordingly, the undersigned finds that the information provided by the confidential informants was corroborated by law enforcement and, thus, is sufficiently reliable to support a finding of probable cause.

### D.    Staleness

Defendant submits that the information in the affidavit is stale at the time the search warrant issued on July 5, 2024 [Doc. 29 p. 20]. Defendant urges the Court to disregard the controlled buy that occurred two days prior, and instead measure the freshness of the information in the affidavit from either the last time Defendant was seen entering unit 24, ten days prior, or from the previous controlled buy on June 21, 2024, fourteen days prior [*Id.*]. In support of his argument, Defendant notes that drug dealing is a fleeing crime and "drugs by their nature are perishable and easily transferable" [*Id.*]. Additionally, Defendant argues the affidavit depicts nomadic behavior in

describing him driving around Knoxville and relating "only a single, non-drug related instance of him entering the apartment . . . ." [*Id.*]. Overall, "the affidavit does not provide any proof that [Defendant] lived at unit 24, stored or sold drugs there, or stored drugs proceeds there" [*Id.*]. Thus, Defendant asserts the affidavit provides no reason to believe contraband would be in apartment 24 more than a week after Defendant's last trip to the apartment [*Id.* at 21].

Assessing whether an affidavit's information is stale is a case-by-case analysis. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (citing *Sgro v. United States*, 287 U.S. 206, 210–11 (1932)). Under this analysis, "the length of time between the events listed in the affidavit and the application for the warrant" is salient but not dispositive. *Id.* When considering whether information presented in support of a request for the issuance of a search warrant is stale, the Court considers: "(1) the character of the crime[, whether it is] a chance encounter . . . or a regenerating conspiracy[], (2) the criminal[, whether he is] nomadic or entrenched[], (3) the thing to be seized[, whether it is] perishable and easily transferable or of enduring utility to its holder[], and (4) the place to be searched [whether it is a] mere criminal forum of convenience or secure operational base[]." *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009) (citing *United States v. Abboud*, 438 F.3d 554, 572–73 (6th Cir. 2006)).

"Evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (citation omitted) (finding that a twenty-three-month-old controlled drug buy from ongoing enterprise was not stale); *see also Spikes*, 158 F.3d at 924 (finding that four-year-old evidence coupled with recent surveillance was not stale when there was ongoing drug trafficking); *United States v. Hammond*, 351 F.3d 765, 771–72 (6th Cir. 2003) (four-month-old information about drug manufacturing not stale); *United States v. Thomas*, 605 F.3d 300, 309–10 (6th Cir. 2010) (eight-month-old information about drug

18

manufacturing not stale); *United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017) (three-week-old drug buy not stale); *United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015) (fifteen-day-old information about drug trafficking not stale). That is the case here. Even if the Court does not consider the July 3 buy, the information was not stale. Information in the affidavit provides ample evidence of continuing drug activity occurring up until both ten days and fourteen days prior to the presentation of the affidavit to the issuing judge on July 5, 2024. Moreover, Defendant presents no valid reason to discount the July 3, 2024 controlled buy, which occurred in much the same way as the other two controlled buys, including being set up using the telephone number associated with Defendant and used in the other controlled buys. And the span of information starts in April 2024 from the initial controlled buy and continues until July.

Therefore, the information provided in the affidavit was not stale.

### E.     Good Faith

"[J]udicial suppression is inappropriate when an officer conducts a search in 'objectively reasonable reliance' on a warrant later deemed to be invalid." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)); *see also United States v. Herring*, 555 U.S. 135, 141–42 (2009) (rejecting automatic exclusion of evidence and, instead, asking whether exclusion will provide "appreciable deterrence"). This is because "'[p]enalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" *United States v. White*, 874 F.3d 490, 505–06 (6th Cir. 2017) (quoting *Leon*, 468 U.S. at 921); *see also Neal*, 106 F.4th at 572 (observing that when the affidavit lacks probable cause, "the authorizing judge—not the officer—is the blameworthy party").

The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well[-]trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. "Some modicum of evidence, however slight[,] between the criminal activity at issue and the place to be searched" will support an officer's good-faith belief in the existence of probable cause. *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018) (quoting *White*, 874 F.3d at 496). Thus, only when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" will the search fall outside the good-faith exception and the evidence be suppressed. *Neal*, 106 F.4th at 572 (quoting *Leon*, 468 U.S. at 923).

Here, the warrant for the search of apartment 24 was based upon probable cause that evidence of drug trafficking would be found at the location. But even if the probable cause was lacking, the evidence seized in the search of the apartment should not be suppressed because the executing officers relied on the search warrant in good faith.

Officer Strickenberger's seven-page affidavit provided the executing officers with evidence of a connection between the apartment and drug trafficking. The investigation of Defendant spanned nearly seven months and involved the use of confidential informants, three controlled drug buys, and ground and aerial surveillance. The information in the affidavit also establishes that Defendant lived at the apartment.

Law enforcement conducted three controlled drug buys. On June 7, 2024, surveilling officers watched Defendant leave the apartment, conduct a suspected hand-to-hand drug transaction, return back to the apartment, leave again, and then conduct a second hand-to-hand drug transaction [Doc. 29-1 ¶¶ 7–8]. In two out of three of the controlled buys, law enforcement observed Defendant traveling from the target location to the agreed-upon location of the controlled

buy [*Id.* ¶¶ 9 (June 21, 2024), 12 (July 3, 2024)]. Similarly, the affidavit recounts Defendant either leaving or arriving to the apartment on two separate occasions [*Id.* ¶¶ 6 (June 6, 2024), 11 (June 25, 2024)].

These connections between drug activity and the apartment provide at least a "minimally sufficient nexus" to support the executing officers' good faith reliance on the search warrants. *Accord Neal*, 106 F.4th at 573 (affirming application of the good-faith exception when the affidavit demonstrated defendant lived at the residence, was recently dealing a large quantity of drugs per a reliable confidential informant and engaged in a single controlled buy). Thus, if Officer Strickenberger's affidavit is found to be deficient in establishing a probable cause, then the evidence seized in the execution of the search warrant still should not be suppressed.

## III. CONCLUSION

For the reasons discussed herein, the undersigned finds as follows:

(1) Defendant has standing to challenge the July 9, 2024 search of apartment 24;

(2) the affidavit provides probable cause for a search warrant, including a nexus between the apartment and criminal activity and fresh information from reliable confidential sources; and

(3) officers searched the apartment in good faith reliance on the search warrant.

21

The undersigned therefore **RECOMMENDS**[1] that the District Judge **DENY** the Motion to Suppress [**Doc. 29**].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs*, 829 F.2d 1370, 1373 (6th Cir. 1987).

22