UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 3:24-CR-80-KAC-JEM |
| KHALID SULLIVAN, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**
**OVERRULING OBJECTIONS AND ADOPTING RELEVANT PORTIONS OF REPORT**

This action is before the Court on Defendant Khalid Sullivan's "Objections to the Report and Recommendation of the Magistrate Judge" [Doc. 46]. Defendant objects to United States Magistrate Judge Jill E. McCook's September 26, 2025 Report and Recommendation ("Report") [Doc. 36]. The Report recommends that the undersigned deny Defendant's underlying "Motion to Suppress Search of 5401 Asheville Highway On July 9, 2024" [Doc. 29] [*See* Doc. 36 at 21-22]. For the below reasons, the Court **OVERRULES** Defendant's objections [Doc. 46], **ADOPTS** relevant portions of the Report [Doc. 36], and **DENIES** the Motion to Suppress [Doc. 29].

I. **Background**[1]

On July 5, 2024 law enforcement applied for; and the Honorable Hector Sanchez, Knox County Criminal Court Judge issued; a warrant to search the residence at "5101 Asheville Highway, apartment unit 24, Knoxville," Tennessee ("Unit 24") [*See* Docs. 29-1, 29-2]. The

---

[1] Defendant does not object to any of the Report's factual findings [*See* Doc. 46]. So, the Court generally adopts the findings with slight modifications herein and summarizes the key relevant facts below. *See* 28 U.S.C. § 636.

affidavit in support of the warrant stated that Unit 24 "is on the 2nd floor" of an apartment complex on Asheville Highway in Knox County, Tennessee ("Apartment Complex") [*Id.*].

The affidavit provided that in "mid-January 2024," a "reliable confidential informant" ("CI") advised law enforcement that a "black male" known as "Khalid Sullivan was selling heroin in the Knoxville area" [Doc. 36 at 2]. Further investigation "linked this individual with Khalid Kari Sullivan," the Defendant [*Id.*]. The CI also advised that Defendant typically "deals drugs out of rental cars in various parking lots in the area" [*Id.*]. And the CI "provided" law enforcement "a phone number" he or she knew Defendant to use [*Id.*].

On April 24, 2024, law enforcement used that phone number to conduct a controlled purchase of "heroin/opiate" [*Id.*]. An unknown "male" "directed" the CI to meet "at the Walgreens on Magnolia Avenue," which is located "on Asheville Highway less than one mile from" the Apartment Complex [*See id.*]. Upon arriving at the Walgreens, the CI purchased a "substance" which "field tested presumptively positive" for "fentanyl" and "Xylazine" [*Id.* at 2-3]. "Based on . . . training and experience," law enforcement knew Xylazine to be a common "cutting agent for fentanyl" that is "known to mask results of fentanyl on certain field tests" [*Id.* at 3]. And Xylazine is itself a "Schedule II" controlled substance [Doc. 29-3 at 6 ¶ 9]. The CI identified Defendant as the individual who sold the drugs [Doc. 36 at 3].

The affidavit further provided that "during" the April 24 controlled purchase, law enforcement observed Defendant "operating a white Dodge Durango" [*Id.* at 3]. Law enforcement confirmed that the Durango was a rental vehicle [*Id.*]. On May 5, the same "Dodge Durango" was parked at the Apartment Complex [*Id.*]. "On May 8" the Durango "was replaced by" another rental vehicle, a "Toyota 4Runner," until "June 6, 2024" [*Id.*]. On "June 6" the Toyota 4Runner was "replaced by" another rental vehicle—a "Dodge Hornet" [*Id.*]. Based on law enforcement's

2

"training and experience," drug dealers "commonly utilize rental vehicles and trade them out often in attempts to" evade detection [*Id.*].

On June 6, while surveilling the Apartment Complex, law enforcement observed Defendant "operating" a "Chevrolet Impala with tinted windows" [*Id.*]. Officers saw Defendant exit the Impala, enter the "second floor" of the Apartment Complex, "walk toward the far-right" side of the building, and "enter an unknown apartment" [*See id.*; *see also* Doc. 29-3 at 5 ¶ 6]. A "law enforcement database" confirmed that the Impala was "registered to **Khalid Sullivan with an address of 5101 Asheville Hwy, apt. unit 24**" [Doc. 29-3 at 5 ¶ 7].

On "June 7, 2024" law enforcement was conducting surveillance on the Dodge Hornet rental and the Impala [Doc. 36 at 4]. Officers observed a "black male leav[e] the second floor" of the Apartment Complex, enter the Impala, and drive to the "parking lot" of the Asheville Highway Walgreens where the April 24 controlled buy had taken place [*Id.*; Doc. 29-3 at 5 ¶ 7]. There, law enforcement observed an interaction of between the "driver of the . . . Impala" and the "driver of a silver van" [Doc. 36 at 4]. The interaction, which lasted "only . . . a few seconds," was "consistent with a hand-to-hand drug transaction" [*Id.*; Doc. 29-3 at 5 ¶ 7]. The driver of the Impala then "returned" to the Apartment Complex and "entered the second floor of the . . . building" "on the right side" before he was no longer visible [*Id.*].

The affidavit further provides that at some point the same day, law enforcement observed Defendant "leave the courtyard area" of the Apartment Complex and enter the Impala [Doc. 29-3 at 5 ¶ 8]. Law enforcement followed Defendant as he drove to the "parking lot" of a Starbucks [Doc. 36 at 4]. There, officers witnessed a "hand-to-hand transaction" between Defendant and the driver of a "Chevrolet Cruz" [*Id.*]. After Defendant left the parking lot, law enforcement "approached" the Chevrolet Cruz and observed "in plain view" the occupants "cutting up a gray

3

powder," which appeared to be " heroin/opiate mixture" [Doc. 29-3 at 5-6 ¶ 8]. The occupants "admitted" to law enforcement that they had "just purchas[ed] heroin" [*Id.* at 6 ¶ 8].

On "June 21," law enforcement used a reliable CI to conduct a second controlled buy from Defendant [Doc. 36 at 4]. The CI called the phone number known to be used by Defendant and "ordered a quantity of suspected heroin/opiate" [*Id.*]. Law enforcement observed Defendant leave the "area of" Unit 24 and "drive directly to the arranged location" [*Id.* at 4-5]. The CI purchased from Defendant a substance that then "tested presumptively positive for Xylazine and Diphenhydramine" [*Id.* at 5; Doc. 29-3 at 6 ¶ 9].

"[O]n June 25" law enforcement observed Defendant exit the Impala at the Apartment Complex and "walk directly to the door of" Unit 24 "with an unknown" female [Doc. 36 at 5]. Defendant "manipulate[d] the lock on the door" and entered the apartment [*Id.*].

"[O]n July 3, 2024," law enforcement conducted a third controlled buy from Defendant [*Id.*]. A CI called the phone number for Defendant and "ordered a quantity of heroin/opiate" [*Id.*]. Law enforcement watched Defendant "leave the area of" Unit 24 and "drive directly" to the arranged meet location [*Id.*; Doc. 29-3 at 6 ¶ 12]. The CI purchased a substance from an individual the CI identified as Defendant [Doc. 36 at 5]. Upon "inspection," and based on "training and experience," law enforcement believed the purchased substance to be consistent with "heroin/opiates" [Doc. 29-3 at 6-7 ¶ 12]. The affidavit stated that "during each" of the three (3) "controlled buy[s]" involving Defendant, law enforcement corroborated the information from the applicable CI "through real-time surveillance and review of the audio and/or video recording" of the transaction [Doc. 29-3 at 6 ¶ 10]. And law enforcement searched the CI for drugs and contraband "before and after each buy" [*Id.* ¶ 9].

From his "training and experience," the affiant-officer "kn[ew] that persons involved in the storage, use, sale, delivery, or exchange of controlled substances, commonly keep and maintain, especially within their residences" "items that they use to conduct or facilitate those activities" [*Id.* at 4 ¶ 2]. So, he believed that a search of Unit 24 would uncover evidence of drug possession and distribution [*See id.* at 3].

The officer was right. The search of Unit 24 on July 9, 2024 yielded quantities of "methamphetamine, suspected fentanyl, three loaded handguns, [and] $12,290 in [U.S.] currency" [*See* Doc. 36 at 6].

Defendant filed a motion to suppress "all evidence collected [at] or arising out of" the July 9, 2024 search [Doc. 29 at 21]. After a hearing on the Motion, Judge McCook issued the Report [Doc. 36]. The Report recommends that the undersigned deny the Motion [*See* Doc. 36 at 21-22]. As relevant here, the Report specifically concluded that (1) the affidavit in support of the warrant established probable cause to search Unit 24 and (2) even if probable cause was lacking, "officers searched the apartment in good faith reliance on the search warrant" [*Id.* at 21].

Defendant filed two objections. First, he argues that the Report erred in concluding that the affidavit established a probable cause "nexus" to search Unit 24 for evidence of Defendant's drug trafficking; second, he argues that the "good faith exception" does not apply [*See* Doc. 46 at 6]. The United States did not object to the Report. It did, however, oppose Defendant's objections [*See* Doc. 47].

## II. <u>Analysis</u>

28 U.S.C. § 636(b)(1) provides that the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The Court considers timely objections de novo. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim

5

P. 59(b)(3). When the district court is tasked with reviewing "the issuing judge's probable cause determination," "[t]he terms of review are settled." *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc). The reviewing court "must afford 'great deference' to the issuing judge's" probable cause determination. *United States v. Long*, 155 F.4th 829, 834 (6th Cir. 2025) (quoting *Sanders*, 106 F.4th at 461). Here, the Court's role is "simply to ensure" that the issuing judge "'had a substantial basis for concluding that probable cause existed' when he issued the warrant." *United States v. Florence*, 150 F.4th 777, 777 (6th Cir. 2025) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).

Probable cause depends on " the totality of the circumstances." *Long*, 155 F.4th at 834 (quotation omitted). The "critical question" is whether, considering all the circumstances, "there was a fair probability" that law enforcement "would find evidence of criminal wrongdoing" in a "particular place." *Florence*, 150 F.4th at 777 (citation omitted); *Sanders*, 106 F.4th at 461. The term "probable cause nexus" is a term of art "reflect[ing] the requirement that [the] affidavit in support of a search warrant sufficiently show that the specific things to be searched for are located on the property" law enforcement seeks to search. *Sanders*, 106 F.4th at 460-61 (cleaned up). The Court reads a search warrant affidavit "reasonably . . . [and] holistically," "employing a healthy dose of common sense." *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018) (quotation omitted); *see also United States v. Peake-Wright*, 126 F.4th 432, 437, 439 (6th Cir. 2025).

Here, *United States v. Sanders*[2] and its progeny make clear that the affidavit established a probable cause nexus. And even if probable cause were lacking, the good faith exception would apply. Starting with *Sanders*, the United States Court of Appeals for the Sixth Circuit sitting en

---

[2] 106 F.4th 455 (6th Cir. 2024) (en banc).

banc explained that when a "search warrant affidavit" "adequately establishes both where a defendant resides as well as . . . [his] active engagement in" drug dealing, "an inference can reasonably be made (especially when aided by an affiant-officer's experience) that the [defendant] keeps the 'instrumentalities and fruits' of his [drug dealing] in his residence." *Sanders*, 106 F.4th at 462 (quotations and citations omitted). *United States v. Simmons*[3] continues along that path. There, the Court noted that "even if no direct evidence ties drug dealing to a home, a nexus exists based on circumstantial evidence if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant." *See United States v. Simmons*, 129 F.4th 382, 387 (6th Cir. 2025) (cleaned up).

These published precedents control and doom Defendant's argument regarding a probable cause nexus. The affidavit established that Defendant was a "known drug dealer" engaged in uninterrupted and ongoing drug-dealing as late as July 3, 2024. *See Simmons*, 129 F.4th at 387 ("An affidavit can [] show ongoing drug activity through the repeated nature of the transactions independent surveillance or witness accounts corroborated by an affiant's experience and training" (cleaned up)). The affidavit also sufficiently established that Defendant resided in Unit 24 during the relevant time. Most notably, the Impala Defendant drove was specifically registered to him **"with an address of 5101 Asheville Hwy, apt. unit 24"** [Doc. 29-3 at 5 ¶ 7]. And on June 25, law enforcement saw Defendant exit the Impala, "walk directly to the door of" Unit 24, "manipulate the lock on the door," and then enter Unit 24 [Doc. 36 at 5]. For good measure, the affiant-officer confirmed that his training and experience suggested that drug dealers "commonly keep and maintain" "certain items" "used to conduct or facilitate" drug dealing and storage "within their residences" [Doc. 29-3 at 3]. Thus, Sixth Circuit precedent forecloses Defendant's argument.

---

[3] 129 F.4th 382 (6th Cir. 2025)
7

Even if a probable cause nexus did not exist, a hypothetical hard to square with existing precedent, the good faith exception would apply. Under the good faith exception, the "exclusionary rule" does not apply "when officers conduct a search in good faith reliance on a judicially authorized warrant." *Sanders*, 106 F.4th at 468 (citing *United States v. Leon*, 468 U.S. 897, 909, 922 (1984)). Defendant argues that the affidavit was "bare bones," that is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" [Doc. 46 at 14 (quoting *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016)]. It is not.

The "moniker," "bare-bones" is generally "reserved" for an affidavit that is "either completely devoid of any nexus between the illegal activity and the place to be searched" or that "merely states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Sanders*, 106 F.4th at 468 (cleaned up). Here, as described in detail above, the facts in the seven (7) page affidavit easily clear that threshold. And law enforcement justifiably relied on the warrant. *See id.* Accordingly, even if the affidavit did not establish probable cause, the good faith exception applies.

### III. Conclusion

As set forth above, the Court (1) **OVERRULES** Defendant's "Objections to the Report and Recommendation of the Magistrate Judge" [Doc. 46], (2) **ADOPTS** relevant portions of United States Magistrate Judge Jill E. McCook's September 26, 2025 Report and Recommendation [Doc. 36], and (3) **DENIES** Defendant's "Motion to Suppress Search of 5401 Asheville Highway On July 9, 2024" [Doc. 29].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

8

Case 3:24-cr-00080-KAC-JEM    Document 49    Filed 01/27/26    Page 8 of 8    PageID #: 346